**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a1076n.06

**No. 11-2366**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
*Oct 12, 2012*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| OSPREY-TROY OFFICENTRE, LLC, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| Defendant-Appellee, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| WORLD ALLIANCE FINANCIAL CORP. | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| | ) | |

Before:  SUTTON and GRIFFIN, Circuit Judges; WELLS, District Judge.[*]

SUTTON, Circuit Judge.  When the fourth floor of an office building sat empty during the summer of 2009, the landlord sued the building's prior occupant for breach of a sublease.  The landlord lost, prompting this question under Michigan law:  May a landlord prevent a tenant and subtenant from terminating their sublease?  That depends—most notably on the language in the underlying contract.  The answer under this contract is no, requiring us to affirm.

I.

Osprey-Troy Officentre is the landlord of a five-floor office building in Troy, Michigan and leases it to commercial tenants.  Lear Corporation leased the building and later, with Osprey's

---

[*]The Honorable Lesley Wells, Senior United States District Judge for the Northern District of Ohio, sitting by designation.

written consent, subleased the fourth floor to World Alliance Financial. All went smoothly with the sublease for two years until Lear filed a bankruptcy petition. Two things happened next.

First, World Alliance and Lear agreed to cancel their sublease. The termination agreement provided that World Alliance would pay Lear (an undisclosed amount) in exchange for allowing the sublease to expire on August 31, 2009, thirty-one months earlier than the sublease called for. Sometime during August 2009, World Alliance vacated the building.

Second, Lear "rejected" its lease with Osprey under a bankruptcy provision that allows a debtor with court authorization to "reject any . . . unexpired lease." 11 U.S.C. § 365(a). Rejection "constitutes a breach" and abandonment of the lease. *Id.* § 365(g).

These two events—Lear's rejection of the lease and its cancellation of the sublease—left Osprey without a tenant or subtenant on the fourth floor. Unable, or at least unwilling, to go after its bankrupt tenant, Osprey sued World Alliance for breach of contract under Michigan law, seeking to hold it responsible for the full length of the five-year sublease. Osprey saw itself as a third-party beneficiary of the sublease with rights to enforce it directly. It also claimed that the termination agreement between World Alliance and Lear was ineffective against Osprey without its consent because its third-party rights had "vested." The district court granted summary judgment to World Alliance.

## II.

The norm under Michigan law, as under the laws of most States, is that the parties to a contract are the only ones who may enforce it. *See Greenlees v. Owen Ames Kimball Co.*, 66

N.W.2d 227, 229 (Mich. 1954). Yet the Michigan courts have long recognized, and the Michigan

legislature has since codified, an exception to this rule for intended third-party beneficiaries of a

contract. Mich. Comp. Laws § 600.1405. According to the statute:

> Any person for whose benefit a promise is made by way of contract, as hereinafter
> defined, has the same right to enforce said promise that he would have had if the said
> promise had been made directly to him as the promisee.
> (1) A promise shall be construed to have been made for the benefit of a person
> whenever the promisor of said promise has undertaken to give or to do or refrain
> from doing something directly to or for said person.

In assessing whether a subtenant (World Alliance) undertook to do "something directly to or for"

a third-party landlord (Osprey), Michigan courts use an "objective standard," examining only the

"form and meaning of the contract itself." *Schmalfeldt v. North Pointe Ins. Co.*, 670 N.W.2d 651,

654 (Mich. 2003).

Osprey does not satisfy this standard. The promise at issue is World Alliance's commitment

to pay rent for the sublease's full five-year duration. World Alliance made that promise to Lear, and

nothing in the subject matter or language of their contract indicates that World Alliance undertook

a five-year sublease term "directly" for Osprey.

It is not enough that Osprey benefitted indirectly from the sublease because World Alliance

occupied the building and made lease payments for the space. The statute requires something more,

as *Kisiel v. Holz*, 725 N.W.2d 67 (Mich. Ct. App. 2006), well illustrates. A home builder

subcontracted with an excavator to pour a foundation. When the concrete cracked, the home owner

sued as a third-party beneficiary of the subcontract. Rejecting the claim, the court explained the

general rule that "although work performed by a subcontractor on a given parcel of property

ultimately benefits the property owner, the property owner is not an intended third-party beneficiary of the contract between the general contractor and the subcontractor." *Id.* at 70. "Absent clear contractual language to the contrary," the court continued, "a property owner does not attain intended third-party-beneficiary status merely because the parties to the subcontract knew, or even intended, that the construction would ultimately benefit the property owner." *Id.* at 70. As with the property owner in *Kisiel*, so too with Osprey.

Unless the sublease contains language to the contrary, then, World Alliance's sublease with Lear does not make Osprey an intended third-party beneficiary. Although Osprey points to provisions in the sublease, the consent agreement and the lease to support its theory, none of them suffices. Here are the provisions on which it relies:

> Paragraph 17 of the sublease: Subtenant agrees to undertake and be bound to Sublandlord and Landlord by all obligations, covenants, agreements, indemnities and restrictions which are set forth in the Lease in the same manner as these obligations, covenants, agreements, indemnities and restrictions are binding upon Sublandlord, as Tenant under the Lease, except as expressly modified by this Sublease. These obligations include, without limit, the obligation to provide insurance, pay personal property taxes and make repairs and replacements as more fully set forth in the Lease.

> Section 13.03 of the lease (which, according to Osprey, is incorporated into paragraph 17 of the sublease): Upon the occurrence of an Event of Default, . . . if all or any part of the Premises are then sublet or assigned, Landlord, in addition to any other remedies provided by this Lease or by law, may, at its option, collect directly from the sublessee or assignee all rent becoming due to Landlord by reason of the subletting or assignment.

> Paragraph 7 of the consent agreement, signed by Osprey, World Alliance and Lear: In accordance with Section 13.03 of the Lease, Subtenant and Tenant acknowledge and agree that upon the occurrence of an Event of Default under the Lease, the rent and other sums due under the Sublease shall be paid directly to the Landlord upon written notification by Landlord to Subtenant and Tenant.

These provisions do not do the trick. They are promises to do "something directly to or for" Osprey, just not the promise Osprey wants to enforce. Yes, World Alliance agreed to pay rent directly to Osprey if Lear breached the lease when all or part of the building was subleased. And yes, World Alliance agreed that while it was subleasing the fourth floor it would comply with the landlord's "obligations, covenants, agreements, indemnities and restrictions" in the lease, such as making repairs and paying taxes. R.13-3 at 8. But for at least three reasons, these promises do not mean that World Alliance agreed to the sublease's five-year term for Osprey's benefit.

First, and most conspicuously, the durational term of the sublease—the five-year provision—does not appear in any of these paragraphs. It appears in paragraph 3, which contains no hint that World Alliance made this commitment to the landlord, as opposed to the tenant. World Alliance never promised Lear, directly or otherwise, that it would fulfill the full five-year sublease even if Lear breached the lease. Nor did World Alliance promise Lear to assume all or a portion of the primary lease under these circumstances.

Second, the five-year term was unique to the sublease. It thus could not have been one of the "obligations, covenants, agreements, indemnities and restrictions" set forth in the underlying lease. R.13-3 at 8. Those "obligations" required World Alliance to follow the landlord's property-related rules while subleasing the property; they said nothing about entering into the sublease in the first instance or above all about agreeing to remain in the sublease for the full five-year term for the landlord's benefit even if the tenant wished to end the sublease earlier.

Third, the payment provision at the heart of Osprey's argument is conditioned on a valid sublease. Section 13.03 of the lease requires World Alliance, in the event Lear breaches the lease, to pay rent directly to Osprey "if all or any part of the Premises are then sublet or assigned." R.13-2 at 16. (Section 13.03 of the lease is then incorporated into the consent agreement through paragraph 7.) The word "if" places a condition on World Alliance's direct-rent obligation: If, and only if, World Alliance is subleasing when Lear breaches must World Alliance pay Osprey directly. The language does not say and cannot bear the construction to say: "I agree to pay rent directly to Osprey *and* to continue to sublease the premises from Osprey in the event Lear breaches." Osprey in essence wants to piggyback the promise of a five-year sublease—an undertaking not made directly to or for Osprey—onto the narrower promises to follow Osprey's tenancy rules and to pay direct rent if Lear defaults while the building is subleased. That will not work. World Alliance committed to a five-year sublease directly to and for Lear and only indirectly for Osprey. As a result, Osprey is not a third-party beneficiary of that promise, and it cannot prevent World Alliance and Lear from prematurely terminating the sublease.

That leaves one other issue. Osprey separately seeks to enforce the consent agreement not as a third-party beneficiary but as a contracting party. While World Alliance and Osprey both signed the consent agreement, creating a mutual contract, World Alliance has done nothing to breach that agreement. The sublease, as shown, conditioned the direct-payment obligation on (1) Lear breaching the lease and (2) the premises being subleased at that time. But prior to Lear's breach, World Alliance and Lear permissibly and legitimately terminated the sublease, rendering the second

condition unmet.  World Alliance owed no contractual duty to Osprey to fulfill the sublease's full

five-year term, and we have no license to create one.

III.

For these reasons, we affirm.